(52 P.3d 371)

No. 87,162

STATE OF KANSAS, *Appellee*, v. DAVID H. SPURLOCK, *Appellant*.

Opinion filed August 23, 2002.

*Mary Curtis*, assistant appellate defender, and *Steven R. Zinn*, deputy appellate defender, for appellant.

*James B. Pattison*, pro tem county attorney, *David E. Yoder*, assistant county attorney, *Matt Treaster*, county attorney, and *Carla J. Stovall*, attorney general, for appellee.

Before KNUDSON, P.J., BRAZIL, S.J., and ROBERT J. FLEMING, District Judge, assigned.

KNUDSON, J.: David H. Spurlock appeals from jury trial convictions for rape of K.B., a child victim, and two counts of aggravated indecent liberties with K.B. The issues on appeal are: (1) Was it error to admit evidence of a prior crime committed by Spurlock; (2) was it error to admit the opinion testimony of a licensed social worker regarding the common symptoms of victims of child abuse; (3) was it error to deny the defendant's motion for mistrial after a police officer testified before the jury that Spurlock had terminated an interview by invoking his right to counsel; and (4) was it error to admit K.B.'s testimony by closed-circuit television?

We affirm. The evidence of a prior crime was admissible independent of K.S.A. 60-455; the testimony of the social worker was not tantamount to vouching for the credibility of K.B.; the police officer's comment on Spurlock's post-*Miranda* silence was harmless error; and the trial court did not abuse its discretion in allowing K.B.'s testimony to be given by closed-circuit television.

David Spurlock lived with his wife, Jolene, in Newton, Kansas. L.B., Jolene's ex-daughter-in-law, took K.B., her 6-year-old daughter, and K.B.'s younger brother to the Spurlock residence for occasional visits. After December 1999, L.B. took her children to the Spurlocks' more frequently because she and her husband were

working additional weekends. Spurlock was K.B.'s step-grandfather, but she was instructed to call him "Uncle David."

While babysitting in the spring of 2000, K.B.'s great aunt and Jolene's sister, Alma Will, noticed some changes in K.B.'s behavior. K.B. took off her clothes in front of her brother and her cousin at odd times, and K.B. kissed them all over while they were playing together. Will told Jolene about this odd behavior of K.B., and Jolene suggested Will should tell L.B.

Shortly after having a conversation with Will, L.B. also began to notice something was wrong with K.B. L.B. saw K.B. kissing the boys on the lips and playing house with her girlfriends while hugging and kissing one another. One day L.B. found K.B. and her friend in bed together under the covers without their clothes. L.B. became hysterical at first and asked K.B. whether somebody was touching her or doing something to her. K.B. started crying and said "that Uncle David had been touching her when she goes to grandma's house." K.B. told L.B. that "every time she [went] to grandma's house that it happen[ed]." When L.B. asked where he touched K.B., she answered, "In my privates."

On April 2, 2000, L.B. and her husband took K.B. to an emergency room and told the nurse of K.B.'s allegations. K.B. talked to the nurse and the police at the hospital. Officer Scott Powell asked K.B. what had happened, and she answered "her Uncle David had been touching her privates" six or seven times. K.B. said that "Uncle David" and she looked at computer screens of naked women and that he had K.B. rub his private parts through his clothes and that he stuck his hands into her pants and touched her private parts. Powell asked K.B. whether Uncle David had ever put anything inside of her, and she answered no.

On the same day, L.B. took K.B. to Wichita, where she was examined by a sexual assault nurse examiner. According to the nurse's notes, K.B. stated, "My Uncle David touches my front privates when I'm asleep. He puts his finger in there. He makes me touch him. He has girls on his computer without their shirts or panties on. He makes me look at that stuff." On examining K.B., the nurse found no evidence of physical trauma.

Detective T. Walton interviewed K.B. on April 3, 2000. K.B. told him Spurlock touched her privates under her clothes and "he put his finger inside of her private." Walton stated he did not use leading questions and he was unaware of the penetration issue at that time. K.B. placed an "X" on the vagina of a drawing of a girl, indicating the place where she had been touched by Spurlock. K.B. stated Spurlock told her not to tell anyone. K.B. told Walton that Spurlock had two computers in a den at the house; one was for children to play games, and the other was his own. K.B. stated Spurlock made her turn around and look at his computer screen, where she saw images of naked women.

Walton interviewed K.B. again on April 5, 2000, at the police station. Walton told K.B. that Spurlock had told him he had never touched her, and K.B. responded by saying, "Well, Uncle David's lying." K.B. told Walton there were times when Spurlock went to the bathroom, took off his clothes, and used a brush on his penis while he made her watch him. K.B. placed an "X" on the penis of an adult male drawing, indicating the place where Spurlock made her touch. K.B. stated she touched Spurlock with her finger and "this yellow milk would come out and get on her hands."

On July 14, 2000, a third interview of K.B. was videotaped. Walton stated he had to use leading questions to K.B., who was reluctant to give detailed facts about the incidents. However, Walton tried to remind K.B. of the facts she had already given him in earlier interviews.

The police seized the computer equipment in Spurlock's residence and found 592 photographs of nude women on a hard drive by using specialized software. The photographs were in unallocated space, and the police computer expert copied them on a computer disc. The expert stated some of these pictures were downloaded from website pages, but he could not tell whether they were deleted manually or automatically by the computer or when they went down to unallocated space.

At trial, the videotape of the interview of K.B. by Walton was played for the jury. K.B. testified by closed-circuit television over defense objection. K.B. stated Spurlock used a brush on his private parts in the bathroom, he made her touch his private parts in the

computer room, and he touched her by pushing with his finger till it hurt. K.B. stated Spurlock touched her in the kitchen, the computer room, and the bedroom. K.B. stated he made her touch his private parts in the computer room, and "there was milk coming out of him, his private part, then he grabbed a napkin, then he wiped it off of me."

Jan Van Patten, a clinical social worker, testified. She had met with K.B. for therapy sessions 18 times between April 24, 2000, and the trial. From her notes, Van Patten recounted the incidents that K.B. told her: Spurlock came to her bed, touched her privates, and kissed her; and Spurlock licked his fingers and "put it in [her] private part" in the kitchen. She was also present at the video interview of K.B. by Walton. During the interview, K.B. stared into the air several times without answering the questions, and Van Patten commented that K.B. was disassociating. Over defense objection, Van Patten explained disassociation was "a way of blocking out things that are too stressful for us to deal with." She also testified over defense objection that it was common in child victims of sex abuse to disassociate.

Lyn Harris, a federal probation and parole officer, testified regarding her interview with Spurlock, whom she was supervising for a prior sex offense involving children. According to Harris, Spurlock was required to report to her whenever he had contact with a police officer. Spurlock called Harris on April 7, 2000, and told her he had a serious problem. Harris agreed to meet with him on April 10, 2000, at his residence. At the onset of their conversation on April 10, Spurlock first discussed the allegations regarding K.B. and told Harris he had searched the internet regarding state prison facilities. Spurlock next acknowledged violation of his parole by having unsupervised contact with a minor. The prosecutor then asked:

"Q. Let me stop you for a minute. Why would he have that condition on his parole?

"A. Because he has—because of the type of conviction that he has.

"Q. Okay. Did it involve children?

"A. Yes.

"Q. And was it a sex case.

"[DEFENDANT'S LAWYER] Your honor, I am going to object, based on our previous motions.

"THE COURT: Noted and overruled for the reasons we have previously taken up outside the presence of the jury. Go ahead.

"Q. [PROSECUTOR] It was a sex offfense involving children?

"A. Yes, it was."

Harris also testified that Spurlock told her he had recently taken down a mirror that had been affixed to the corner of a wall in the computer room so that Jolene could see into the room when the children and the defendant were using the computers. The mirror had been installed as a requirement of Spurlock's parole.

The jury found Spurlock guilty of all three charges. He was sentenced to 653 months' imprisonment for rape and 61 months for each count of aggravated indecent liberties, with the sentences imposed consecutively.

## Discussion .

### Prior Crimes Evidence

The trial court determined the conversation between Spurlock and Harris that alluded to his prior conviction and parole status was admissible under K.S.A. 60-455 to show intent and plan under the two counts of aggravated indecent liberties with a child. The court also found the evidence was independently admissible to explain the relationship between Spurlock and Harris and the factual circumstances of their discussion.

Spurlock contends the trial court abused its discretion in admitting evidence of his prior conviction under K.S.A. 60-455. He argues the evidence was irrelevant and its prejudicial impact upon the jury far outweighed any probative value.

K.S.A. 60-455 allows the introduction of prior crimes evidence "when relevant to prove . . . motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." However, there are three requirements that must be satisfied to support admission of the evidence: (1) The evidence must be relevant to prove one of the facts specified in the statute; (2) the fact must be a disputed, material fact; and (3) the probative value of the evidence must outweigh its potential prejudice. *State*

*v. Tiffany*, 267 Kan. 495, 498, 986 P.2d 1064 (1999) (quoting *State v. Lane*, 262 Kan. 373, 388, 940 P.2d 422 [1997]). "If the requirements for admission of evidence of prior crimes pursuant to K.S.A. 60-455 are met, the scope of appellate review is limited to whether the district court abused its discretion. Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable." *Tiffany*, 267 Kan. 495, Syl. ¶ 2.

In *State v. Bly*, 215 Kan. 168, 176, 523 P.2d 397 (1974), the court held that where an armed robber extracted money from a store owner at gunpoint, his felonious intent was obvious from the act itself and was not really in material dispute; therefore, prior crimes evidence to prove intent should not have been admitted. As in *Bly*, Spurlock did not offer an innocent acts defense to the charges of aggravated indecent liberties with a child, so the issue of intent was not in material dispute. Because there was no credible evidence of an innocent touching, the prior crimes evidence was not admissible under K.S.A. 60-455 to prove intent.

We next consider whether the evidence was admissible to show plan. In *State v. Damewood*, 245 Kan. 676, 681-82, 783 P.2d 1249 (1989), the court acknowledged evidence might be admitted under K.S.A. 60-455 to show the modus operandi to commit similar but totally unrelated crimes. The court explained: "The rationale for admitting evidence of prior unrelated acts to show plan under K.S.A. 60-455 is that the method of committing the prior acts is so similar to that utilized in the case being tried that it is reasonable to conclude the same individual committed both acts." 245 Kan. at 682.

Subsequently, *Damewood* was held to be controlling in *State v. Clements*, 252 Kan. 86, 90, 843 P.2d 679 (1992), with the court observing "[t]he general method used by Clements to entice young boys is similar enough to show a common approach that is tantamount to a plan."

In both *Damewood* and *Clements*, factual evidence was presented to establish the similarity of the prior crimes with the present charges against the defendants. At Spurlock's trial, the State did not offer any facts of Spurlock's prior crime to show similar situations in which he committed aggravated indecent liberties.

The State only proved that he had a military conviction of sexual abuse of children. It did not explain whether the victim in the military case was also a young girl or any other circumstances of the prior crime. This failure to present factual evidence to establish modus operandi is fatal. The trial court erred in admitting the prior crimes evidence under K.S.A. 60-455 to prove plan.

We must next consider whether the prior crimes evidence was admissible independently of K.S.A. 60-455. Our standard of review is abuse of discretion by trial court in its ruling. See *State v. Lumley*, 266 Kan. 939, 950, 976 P.2d 486 (1999).

Harris testified regarding her interview with Spurlock, who had made somewhat self-incriminating statements. She stated Spurlock called her by telephone on April 7 and told her he had a serious situation. He was required to report to her whenever he had law enforcement contact. Harris went to his house on April 10 to speak to Spurlock. He told Harris that he had been searching the internet to obtain information about state prison facilities. Spurlock admitted to Harris that he had violated his parole conditions, which prevented him from unsupervised contact with children, when Jolene went into a grocery store, leaving him alone with the children in a car. Spurlock told Harris he took down a mirror in the computer room which was set up so that Jolene could see into the room, and he admitted he put himself at risk with the children.

In *State v. Spresser*, 257 Kan. 664, 667-68, 896 P.2d 1005 (1995), the court recognized that prior crimes evidence may sometimes be admissible independent of K.S.A. 60-455. The court stated:

"Evidence that has a direct bearing on, and a relation to, the commission of an offense is admissible without a limiting instruction and is not rendered inadmissible because it may disclose other or independent offenses. The law allows the admission of evidence as part of the res gestae of acts made before, during, or after the principal event. *State v. Bowman*, 252 Kan. 883, Syl. ¶¶ 2, 5, 850 P.2d 236 (1993). If the evidence is a part of the res gestae of the offenses for which a defendant is being tried, such evidence may be introduced independent of K.S.A. 60-455. See *State v. Gilder*, 223 Kan. 220, 228, 574 P.2d 196 (1977).

"Acts done or declarations made before, during, or after the happening of the principal fact may be admissible as part of the res gestae where they are so closely connected with it as to form in reality a part of the occurrence. Evidence that does not constitute a portion of the crimes charged is admissible if there are some

natural, necessary, or logical connections between the evidence and the inference or result which it is designed to establish. *State v. Davis*, 236 Kan. 538, 539, 694 P.2d 418 (1985)." 257 Kan. at 667-68.

In *State v. Edwards*, 264 Kan. 177, 955 P.2d 1276 (1998), the court again considered the independent admission of prior bad acts. The defendant Edwards was convicted of first-degree murder, aggravated robbery, and conspiracy to possess hallucinogenic drugs with intent to sell. The State's theory was that Edwards killed a drug dealer during a robbery to obtain drugs. In the course of their investigation, the police searched the defendant's girlfriend's apartment and found drug paraphernalia and marijuana. At trial, the paraphernalia and marijuana were introduced in evidence over Edwards' timely objection that the evidence was not admissible under K.S.A. 60-455.

The trial court overruled the objection, stating the evidence would be admitted as part of the res gestae and because of its relevance to the charge of conspiracy to possess hallucinogenic drugs with intent to sell. The Supreme Court concluded it was error to admit the evidence under a theory of res gestae, but then explained:

"In addition to finding that the evidence was part of the res gestae, the trial court found that the evidence was relevant to prove the conspiracy to possess marijuana with intent to distribute charge. This court has long held that evidence which has relevance in proving the crime at issue is admissible independent of K.S.A. 60-455, even if it discloses another or independent offense. *State v. Sexton*, 256 Kan. 344, Syl. ¶ 1, 886 P.2d 811 (1994); *State v. Peck*, 237 Kan. 756, 762, 703 P.2d 781 (1985). Evidence is relevant if it renders the desired inference more probable than it would be without the evidence or if it has any tendency in reason to prove any material fact. *State v. Sexton*, 256 Kan. 344, Syl. ¶ 1." 264 Kan. at 201.

We find the rationale expressed in *Edwards* persuasive authority to support the trial court's decision to admit the evidence against Spurlock. Under our limited standard of review, we hold the fact of and nature of Spurlock's conviction were relevant to explain the parole officer/defendant dichotomy, the reason for the specific conditions of parole, and the significance of Spurlock's statements to Harris. We further hold that the trial court struck an appropriate

balance between the probative value of the evidence and the potential prejudice to Spurlock by excluding details of the prior crime.

*Testimony of Social Worker*

The admission of expert testimony lies within the sound discretion of the trial court. Expert opinion testimony is admissible if it aids the jury with unfamiliar subjects or in interpreting technical facts or if it assists the jury in arriving at a reasonable factual conclusion from the evidence. *Simon v. Simon*, 260 Kan. 731, 735, 924 P.2d 1255 (1996). An appellate court's standard of review regarding a trial court's admission of evidence, subject to exclusionary rules, is abuse of discretion. Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable. *Lumley*, 266 Kan. at 950.

Spurlock argues the trial court erred in allowing Van Patten to give an opinion as to the reasons for K.B.'s reticence, relying on the holdings in *State v. Jackson*, 239 Kan. 463, 470, 721 P.2d 232 (1986), and *State v. Mullins*, 267 Kan. 84, 96, 977 P.2d 931 (1999).

In *Jackson*, two social workers who investigated allegations of molestation testified over the defendant's objection and before the jury that, in their opinions, the victim was telling the truth and the victim was sexually abused by the defendant. The court stated "the witnesses attempted to serve as human lie detectors for the child" and held "it was the function of the jury to hear the testimony of the witnesses as to what the child said, and then to make a determination of the reliability of the child's statements." 239 Kan. at 470. The court concluded the admission of this expert testimony was prejudicial and reversible error and reversed the conviction. 239 Kan. at 470.

In *Mullins*, a registered nurse who conducted a physical examination and interview of a young victim, B.M., testified there were no signs that he had been "coached." The court stated the nurse clearly had the education and background necessary to testify as an expert and stated the issue was whether asking if the victim appeared to have been coached as to what to say was improper and, if it was, would it be considered harmless error or so egregious

an error as to require reversal and a new trial. 267 Kan. at 94. The court concluded:

"There are subtle and not so subtle distinctions in the manner in which the questions leading to a suggestion of truthfulness of the victim are asked. When the trial court overruled defense counsel's objection, Phillips [the nurse] rephrased the question, 'I thought he had been coached?' and answered, 'No.' Technically, as prohibited by [*State v. Lash*, 237 Kan. 384, 699 P.2d 49 (1985)] and *Jackson*, the question asked of Phillips does not allow the giving of an opinion that B.M. had been sexually assaulted by Mullins or render an opinion that he was telling the truth. This does not, however, mean the question was proper, as it implies truthfulness." 267 Kan. at 96.

The *Mullins* court stated the question was directed to whether B.M. was coached, which was another way of asking if he was telling the truth. The court held the trial court erred in allowing the question to be answered, although it was a close question. However, the court applied the harmless error rule of K.S.A. 60-261 and concluded the error did not "cause prejudice to the substantial rights of Mullins so as to be inconsistent with substantial justice." 267 Kan. at 97.

In this case, Van Patten was a licensed clinical social worker in private practice who became K.B.'s therapist after K.B.'s allegations were revealed. She had met with K.B. for counseling and rehabilitation for the effects of sexual abuse. She met with her a total of 18 times, and, on two occasions, K.B. talked about the alleged incidents. During the April 24, 2000, interview with K.B., Van Patten went over the difference between the truth and a lie, and K.B. could very easily tell the differences. During the interview, K.B. voluntarily stated Spurlock touched her private area and her breast underneath her clothes. K.B. told Van Patten that Spurlock made her touch his private parts in the bedroom.

During the September 18, 2000, session, K.B. stated Spurlock touched her private parts and kissed her in the bedroom and "[m]ilk came out and he took toilet paper to wipe it off." K.B. further stated in the kitchen Spurlock licked his fingers and "put it in [her] private part." These statements were made without defense objections.

The complained-of statements of Van Patten were made while explaining why K.B. was reluctant to talk about the allegations of abuse during the videotaped interview with Walton in her office. K.B., in fact, denied certain things happened, although the State's witnesses stated K.B. voluntarily revealed those things in their earlier interviews. Van Patten explained this as "disassociation." Over defense objection, she further stated it was a common phenomenon for child victims of sex abuse to disassociate.

The courts have held that an expert's opinion is admissible up to the point where an expression of opinion would require the expert to pass upon the credibility of witnesses or the weight of disputed evidence. Although an expert may give his or her opinion on an ultimate issue, the expert may only do so insofar as the witness aids the jury in the interpretation of technical facts or assists the jury in understanding the material in evidence. *State v. Heath*, 264 Kan. 557, 576, 957 P.2d 449 (1998).

In her testimony, Van Patten did not state she believed K.B. was sexually abused by Spurlock, and she did not render an opinion that K.B. was telling the truth. Van Patten's testimony on disassociation offered an explanation of K.B.'s behavior during the interview from the psychological point of view. The jury heard testimony of the police officers and the nurse who interviewed K.B., and the jury watched the videotaped interview. The jury watched K.B. testify via closed-circuit television at trial. The jury was free to decide K.B.'s credibility through her consistent and inconsistent statements. This case is factually distinguishable from *Jackson* and *Mullins*. Van Patten's testimony was not an impermissible comment on K.B.'s credibility but rather an opinion intended to assist the jury in understanding possible psychological consequences recognized and attributable to posttraumatic stress disorder.

*Motion for Mistrial*

Spurlock argues the trial court erred in denying his motion for mistrial after Detective Walton mentioned that Spurlock had invoked his right to counsel during his interview.

"A trial court should terminate the trial and grant a mistrial if prejudicial conduct makes it impossible to proceed without injustice to the defendant. K.S.A.

22-3423(c). A decision on a motion for mistrial is within the trial court's discretion and will not be disturbed on appeal absent a clear showing of abuse of discretion. *State v. Vontress*, 266 Kan. 248, 254-55, 970 P.2d 42 (1998); *State v. Stallings*, 246 Kan. 642, 646, 792 P.2d 1013 (1990). The defendant has the burden of showing substantial prejudice before an appellate court will find an abuse of discretion by the trial court. *State v. McClanahan*, 259 Kan. 86, 92, 910 P.2d 193 (1996)." *State v. Manning*, 270 Kan. 674, 696, 19 P.3d 84 (2001).

It is constitutionally impermissible for the State to elicit evidence at trial of an accused's post-*Miranda* silence. *Doyle v. Ohio*, 426 U.S. 610, 618, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976). A *Doyle* violation occurs when the State attempts to impeach a defendant's credibility at trial by arguing or by introducing evidence that the defendant did not avail himself or herself of the first opportunity to clear his or her name when confronted by police officers but instead invoked his or her constitutional right to remain silent. *State v. Edwards*, 264 Kan. 177, 195, 955 P.2d 1276 (1998). It makes no difference whether the evidence was presented on direct or cross-examination, because the potential for prejudice is the same in both situations. *State v. Fisher*, 222 Kan. 76, 83, 563 P.2d 1012 (1977).

In considering Spurlock's motion for a mistrial, the court reviewed the exchange between Walton and Spurlock's counsel and held that error had in fact occurred. However, the court concluded the error did not warrant a mistrial and offered to give a curative instruction to the jury. The defense counsel, after consulting with Spurlock, declined the offer of a limiting instruction but requested to ask the same question and obtained the short answer, "No, he did not" from Walton, who did not refer to defendant's right to counsel.

We must decide whether the violation was so prejudicial as to require a new trial. This question is measured by the constitutional standard of harmless error, which is based on a belief beyond a reasonable doubt that the error did not contribute to the verdict. To facilitate the determination of whether a comment on a defendant's post-*Miranda* silence was harmless error, Kansas appellate courts consider the nature and extent of the comment in comparison with the strength of the evidence of the defendant's guilt,

and further consider whether the language used was manifestly intended to be, or was of such character that the jury would naturally and necessarily take it to be, a comment on the failure of the defendant to testify. *Edwards*, 264 Kan. at 196; *State v. Gadelkarim*, 256 Kan. 671, 685, 887 P.2d 88 (1994).

In this case, the State clearly did not intend to introduce the fact that Spurlock invoked the right to counsel while talking to Walton. In fact, the comment was a response to the questions by the defense counsel, who repeatedly asked Walton the same question— whether Spurlock denied the allegations at the interview at the police station. After the jury was brought back, the defense again asked if Spurlock had admitted to any of the allegations made against him, and Walton replied, "No, he did not." The State never raised the topic of Spurlock's silence again in its examination or closing argument. Walton's brief comment on Spurlock's invocation of his right to counsel was not of such character that the jury would naturally and necessarily take it to be a comment on Spurlock's failure to testify.

In *State v. Higgins*, 243 Kan. 48, 755 P.2d 12 (1988), the subject of the defendant's silence initially arose during the defense's cross-examination of a witness for the State; the State, however, further questioned the witness in detail about the defendant's refusal to talk after his arrest, and the State emphasized the defendant's silence again during closing argument. The facts of this case are more similar to those in *Edwards* and *Gadelkarim* and are distinguished from those in *Higgins*.

Moreover, the strength of the evidence indicating Spurlock's guilt contravenes the argument that he was denied the right to a fair trial by the officer's comment that Spurlock invoked his *Miranda* rights. The prejudicial value of the evidence was not great; there was little chance that a jury would have considered it to be a comment on Spurlock's failure to immediately assert his innocence. The error was harmless. See *Edwards*, 264 Kan. at 196; *Gadelkarim*, 256 Kan. at 686. The trial court did not abuse its discretion in denying Spurlock's motion for mistrial.

*K.B.'s Testimony by Closed-circuit Television*

Spurlock argues the trial court permitted K.B. to testify by closed-circuit television in violation of his 6th Amendment right.

K.S.A. 22-3434 provides a statutory procedure by which an alleged child victim of a crime may testify outside the courtroom and the testimony may be televised by closed-circuit equipment. A defendant in a sexual abuse trial is not denied the constitutional right to confrontation where the child testifies via closed-circuit television, pursuant to K.S.A. 22-3434, provided the trial court (1) hears evidence and determines use of the one-way closed-circuit television procedure is necessary to protect the welfare of the particular child who is testifying; (2) finds that the child would be traumatized, not by the courtroom generally, but by the presence of the defendant; and (3) finds that the emotional distress suffered by the child in the presence of the defendant is more than de minimis, *i.e.*, more than mere nervousness or excitement or some reluctance to testify. *State v. Chisholm,* 250 Kan. 153, 166, 825 P.2d 147 (1992).

The State filed a pretrial motion for K.B. to testify via closed-circuit television. At the hearing, Van Patten testified K.B. would "shut down" in a courtroom setting where Spurlock and her grandmother were present and K.B. was aware that her grandmother did not believe what she had said and supported Spurlock. Van Patten testified K.B. would feel intimidated and anxious because of the divided loyalties about her grandmother and Spurlock.

The trial court recited the K.S.A. 22-3434 standard that the State had to establish by clear and convincing evidence and found the State had met its burden under the statute. The court found, first of all, Van Patten was qualified to give an opinion regarding K.B.'s possible emotional distress at testifying in the courtroom because she had an in-depth perception and understanding of K.B. from almost a year's counseling sessions. The court found there would be "much higher degree of traumatization" if K.B. were to testify in the courtroom where family members and Spurlock would be present. The court concluded the open court setting would have "a good chance of preventing her from communicating reasonably with counsel and with the jury." The court held the State had met its burden under K.S.A. 22-3434.

Although the trial court did not use the precise language in K.S.A. 22-3434, it stated the particularized findings of trauma suf-

ficient to satisfy the standard. See *Chisholm*, 250 Kan. at 166-67. We conclude the trial court did not err in allowing K.B. to testify by closed-circuit television after finding the requirements in 22-3434 were satisfied.

Affirmed.