NOT DESIGNATED FOR PUBLICATION

No. 112,679

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee,*

v.

JOHN HODGES,
*Appellant.*

MEMORANDUM OPINION

Appeal from Shawnee District Court; MARK S. BRAUN, judge. Opinion filed January 15, 2016.
Affirmed.

*Ryan J. Eddinger*, of Kansas Appellate Defender Office, for appellant.

*Jodi Litfin*, assistant district attorney, *Kyle Edelman*, assistant district attorney, *Chadwick J. Taylor*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, C.J., BRUNS, J., and ROBERT W. FAIRCHILD, District Judge, assigned.

*Per Curiam*:  John Hodges appeals his conviction of one count of aggravated indecent liberties with a child. Hodges argues that the district court erred when it denied his motion for a new trial because the State's expert witness impermissibly commented on his credibility when he testified that Hodges' recollection of the incident differed from other witnesses because Hodges could be suffering from confabulation or he could be lying about what he remembered.

We find that the district court properly denied Hodges' motion for new trial and we affirm Hodges' conviction.

FACTS

John Hodges was charged with one count of aggravated criminal sodomy where the victim was less than 14 years old and the offender was 18 years old or older, an off-grid person felony. Hodges was also charged with one count of aggravated indecent liberties with a child less than 14 years old by an offender who was 18 years old or older. The offense is an off-grid person felony. After the preliminary hearing, the district court bound Hodges over on the aggravated indecent liberties charge but dismissed the aggravated criminal sodomy charge.

Christopher O. lived in an apartment complex on Tyler Street in Topeka with his wife and three children. Christopher's 11-year-old daughter, J.O., was born with cerebral palsy and was legally deaf and blind. J.O. was unable to walk and she got around by using a wheelchair, crawling, or walking on her knees.

During the early evening of May 24, 2013, Christopher was watching television in the living room and watching his two other children who were cooking in the kitchen. Christopher's wife and his nephew had left to rent a movie. At some point, Christopher heard a knock on the door. He answered the door and Hodges and another male asked if a previous tenant was there. Christopher explained that he and his wife rented the apartment now and the previous tenant had moved out. Christopher had never seen or heard of Hodges or the other man before.

After Christopher told them that the previous tenant did not live at the apartment, the other male went to an apartment across the hall. Hodges asked if he could have a glass of water, and Christopher let him in. Christopher provided Hodges with water in a

2

red plastic cup. While Hodges and Christopher were in the kitchen, J.O. crawled into the kitchen and handed her sippy cup to Hodges. Hodges approached the sink to fill the cup with water but Christopher stopped him because J.O. can only have PediaSure. After Christopher gave the sippy cup back to J.O., she crawled down the hall toward her bedroom.

J.O. was wearing dark colored sweat pants and a shirt. She also wore a diaper because she was unable to use the bathroom on her own. J.O. would remove her own diaper when she needed a new one. She would then get a new diaper and bring it to an adult for assistance. However, she could not do this when she was wearing pants because the drawstrings of her pants were tied and she could not remove them.

After Hodges got his water, he asked if he could use the restroom and Christopher directed him down the hall to the restroom. Christopher went back to the living room and continued to watch TV. Christopher's other daughter called him into the kitchen to help her drain some noodles. While he was in the kitchen, he heard the door shut to the bedroom shared by all of the children. J.O. was able to shut the door herself but Christopher went to check on her after the door had been closed for 2-5 minutes.

When Christopher opened the door, he saw J.O. on the floor lying on her back and Hodges was on the floor lying on his side. Hodges had his pants down and was masturbating. J.O.'s pants and diaper were off and her legs were spread apart. When Christopher opened the door, he saw Hodges' head come up from J.O.'s crotch area.

When Christopher opened the door and saw this, he asked Hodges what the hell he was doing. Christopher yelled to his son to run upstairs to get his sister-in-law's boyfriend, James Lee, and went to his bedroom closet to retrieve his shotgun. Christopher heard the bedroom door close again. Christopher retrieved the shotgun, went back to the bedroom, and opened the door again. When he opened the door again, Hodges was trying

3

to pull his pants back up. J.O. was still naked from the waist down. Christopher told Hodges he had 3 seconds to get out of the apartment. Christopher then walked Hodges out of the apartment.

As Hodges and Christopher left the apartment, Lee was coming down the stairs with a baseball bat. Lee and Christopher walked Hodges out of the apartment building. As they walked him out of the apartment building, Christopher told people what Hodges had done. Hodges denied what Christopher was saying and said he did not know what Christopher was talking about.

As Hodges was going down the steps into the parking lot, Lee hit the side of Hodges' head with the baseball bat. Hodges fell over, got back up, and crossed the street. As he was crossing the street, Hodges yelled that he would be back. Hodges was not slurring his words at this time, and Christopher did not smell any alcohol on Hodges.

After 15 or 20 minutes, Christopher returned to the apartment. He went to the children's bedroom and J.O. was still there. He noticed that the red plastic cup that contained Hodges' water was in the bedroom. J.O. was still naked from the waist down, so Christopher put a new diaper on her and called the police.

Roger Smith, a detective with the Topeka Police Department, was assigned to investigate the incident. Smith arrived at Christopher's residence around 9 p.m. and spoke with Christopher. Christopher identified a photograph of Hodges as the person who assaulted his daughter. After talking with Christopher, Smith issued an attempt to locate Hodges.

John Sanders, a sergeant with the Crime Scene Unit, collected the plastic cup Hodges drank out of and the diaper J.O. had been wearing. He also used a black light on bedding that was on the floor. There was no evidence that Hodges ejaculated in the

4

bedroom, and the black light did not reveal anything on the carpet or walls. Sanders also collected a second diaper that J.O. was wearing when he arrived, the clothing J.O. was wearing, and the blankets that were on the floor. All of the items collected were sent to the Kansas Bureau of Investigation for testing. The red plastic cup, the blankets, and one of the two diapers were tested for saliva and seminal fluid; the other diaper had mold on it and could not be tested. All of the items tested negative for saliva or seminal fluid.

Officers located Hodges and Smith spoke with him the following day. The interview was held a little after 8 a.m. at the law enforcement center. Before interviewing Hodges, Smith read him his *Miranda* rights. Hodges said that he drank three beers in an hour on Friday afternoon but stayed at home all evening. Later, Hodges stated that he did go to Tyler Street with a friend that evening, but he could not provide the name of his friend or where he lived.

Hodges told Smith he could not remember how he got into Christopher's apartment. Hodges also told Smith that he remembered a girl in a wheelchair who "smelled like piss." Hodges told Smith that he left the apartment not long after he saw the girl. Hodges also said that when he was outside the apartment building he was confronted by Christopher and hit several times with a baseball bat. Hodges said that after he was hit with the baseball bat, he yelled at Christopher that he needed to call the police. Hodges also stated that he told Christopher that he did not touch his daughter and that he would not do anything like that. After the interview, Hodges was arrested.

The district court held a jury trial on the aggravated indecent liberties charge in June 2014. Michael Riley testified that he had known Hodges for 20 or 25 years. On May 24, 2013, Hodges asked Riley for a ride to the apartment complex on Tyler Street where Riley's sister lived so he could get food. When they arrived at the complex, Riley and Hodges went to Riley's sister's apartment. Hodges told Riley he needed to go down to the end apartment. Hodges knocked on the end apartment door, and a white male answered.

5

Hodges and the man talked in the doorway for a while, and Hodges then entered the apartment while Riley stayed outside. Riley saw Hodges go down a hallway inside the apartment and told the man who answered the door to tell Hodges that he was going to his sister's apartment and he would be back.

Riley saw Hodges again as he was leaving his sister's apartment. Hodges was running down the hallway, and the man who had answered the door at the apartment was behind him with a gun. The man told Hodges, "You just molested my daughter." Hodges denied that allegation. Riley noticed that Hodges' pants were unzipped. Riley followed Hodges and the man outside the apartment complex. Once they were outside another man came outside and knocked Hodges to the ground. The man with the gun said he was calling the police, and Hodges attempted to get into Riley's car, but Riley said no because he did not know what was going on. Hodges then ran off.

Hodges also testified at the trial. Hodges testified that on the evening of May 24, 2013, he went to "Tyler" with a person named Mike Riley. When they arrived at the apartment complex, they went to an apartment where a black lady that Riley knew lived. Hodges went inside and sat on the couch while Riley talked to the woman. After a while, Riley and the woman left Hodges alone in the apartment. Hodges stated that very shortly after Riley left with the woman, a young girl in a wheelchair came around the corner and sat near Hodges. Hodges said hello to the girl and started sweating and feeling sick. Hodges began to see double and knew he was going to black out because he had experienced many blackouts before. After he started seeing double, Hodges "smelled some urine, piss, like she hadn't been trained, and then all of a sudden, I went into a black out."

Hodges testified that when he came out of the blackout, he saw the girl lying there and wondered whether he had hurt her. He was not aware he was in a bedroom until he

saw a dresser drawer and a bed. At that time, Christopher opened the door and asked Hodges, "What the heck are you doing?"

When Christopher entered the room, Hodges testified that he was checking to see if J.O. was breathing. When Christopher came into the room and asked Hodges what he was doing, Hodges jumped up and told Christopher he was not doing anything. Hodges left the room, went into the hallway, and experienced another blackout.

Hodges testified that he did not come out of the second blackout until he went down the apartment stairs and back to the car in which he and Riley arrived. At that point, Christopher was outside his apartment and Riley came out of the building. They were talking to each other loudly, and Christopher went back into his apartment. Hodges asked Riley what Christopher was talking about, and Riley responded, "He said something that you messing with his daughter." Hodges told Riley he was not messing with Christopher's daughter.

Hodges also testified that when he and Riley were sitting in the car someone came up behind Hodges and hit him in the back of the neck and his back with a baseball bat. Hodges asked the man what he was doing, and the man said, "Yeah, man, it was you. It was you." The man swung the bat and hit Hodges' arm and face. He also hit Hodges on the back again and near his side. Hodges went across the street, and the man hit him with the bat in his ribs. As the man went back across the street, Hodges told him, "You think I did something, call the police."

Hodges testified that he blacked out for a third time and did not remember how he got home. Hodges testified that he must have been on "[s]ome kind of a trip." Hodges stated that after he came to, he had a beer, got himself together, and lay back down on his bed wondering what was going on. A police officer came to his house and told him they needed him to come downtown because a detective wanted to speak with him. Hodges

7

asked if they could help him get dressed, and the police officer helped him get ready and took him to the police station.

When he got to the police station, Hodges spoke with Detective Smith. He testified that he remembered speaking to Smith and somewhat remembered what he said to him, but he was tired from drinking and had consumed another beer that morning. Hodges also testified that he was stressed because he really wanted to know what happened during the blackout and if he had hurt someone.

Robert Barnett testified at trial. Barnett is a clinical psychologist and board certified as a forensic examiner. The district court certified Barnett as an expert. Hodges' attorney asked Barnett to evaluate whether Hodges' severe substance abuse of alcohol contributed to what occurred on May 24, 2013, and whether Hodges experienced an alcoholic blackout during the incident.

Barnett testified that he evaluated Hodges on December 11, 2013. Barnett noted that Hodges was lethargic, seemed to be tired, somewhat exhausted, confused at times, and Barnett got the impression that Hodges was overmedicated or sedated. Barnett testified that "[Hodges] appeared to make a reasonable effort to respond to my questions. I didn't have any sense that he was being misleading or unreceptive."

Barnett believed Hodges had low intellectual functioning based on his test performances. Hodges scored at a third grade reading level making him functionally illiterate. Hodges suffered from depression but a psychopathy checklist showed that Hodges did not suffer from antisocial personality disorder.

Barnett believed that Hodges' memory was consistent with his level of intelligence; it was poor. Hodges told Barnett that when he was arrested he was consuming five tall cans of strong beer per day. Hodges reported that he had been

8

drinking for 10 years and if he stopped drinking he would get sick. Barnett testified that this indicated that Hodges was having alcohol withdrawals. Hodges also told Barnett that he would use crack cocaine daily when he had money, he had been in 11 different substance abuse treatment programs, and his longest period of sobriety was 17 months.

Barnett concluded that Hodges had a severe alcohol dependence disorder and a severe crack cocaine dependence disorder, both of which were only in remission due to his placement in custody. Barnett also concluded that Hodges suffered from adjustment disorder with depressed mood and borderline intellectual functioning.

Barnett testified that more serious long-term alcoholics start experiencing alcoholic blackouts. Specifically, the blackouts are referred to as embloc blackouts. When an embloc blackout occurs, the alcoholic behaves in a way that appears normal to others around them but they have a very low memory of what they have done. A person having an embloc blackout is not necessarily aware they are having a blackout. A person can also suffer from a fragmentary blackout, which is a less severe blackout. A person suffering from a fragmentary blackout will have knowledge of what happened during the blackout but the knowledge will be fragmentary or partial.

Barnett believed that Hodges was having an embloc blackout on the night of the offense. He believed this because Hodges' description of the incident was consistent with an embloc blackout. Barnett also reviewed a transcript of statements Hodges made to Brenda McCollough on the telephone the day after his arrest, and Hodges made it clear that he had no idea why he was arrested. Because Hodges had no memory of what happened, it was not a fragmentary blackout. Embloc blackouts can occur after binge drinking but are not common in people who are not alcoholics.

Barnett testified that Hodges' behavior the evening of the incident was not random or accidental. It was goal directed and propulsive behavior. However, his formation of

9

intent was different than that of a person not suffering an embloc blackout. His formation of intent was different than it would have been if he was not intoxicated. Barnett testified that it was possible Hodges was not aware he was with a child because his judgment was grossly impaired and, while he may have had some awareness at the time, he had no memory of it.

William Logan, a board certified doctor in psychiatry licensed to practice in Kansas, testified next. The district court qualified Logan as an expert. The State requested that Logan interview Hodges to provide an evaluation of Hodges' mental state at the time of the offense. Logan was provided with a transcript of the preliminary hearing; police reports and investigative materials; the complaint, affidavit, and offense report; and a report of the evaluation Barnett conducted. When Logan interviewed Hodges, he conducted a standard psychiatric interview where he discussed Hodges' childhood, adult functioning, history of mental health problems, substance abuse problems, and had Hodges recount what happened on the day of the offense.

During the interview, Hodges was alert and gave an extensive history of what had happened prior in his life. He also had a good memory about the offense and the events that related to it. Hodges was able to tell Logan what he had done the day of the offense in detail. Logan testified that, "There is [*sic*] a number of discrepancies between what others saw and what he was telling me, and it could either be—it could be due to memory problems an alcoholic sometimes have [*sic*]. Sometimes they don't remember, a process called confabulation, or could be just not telling the truth about."

Hodges objected to the statement because it was impermissible for Logan to suggest that Hodges was lying. The State argued that Logan was not testifying that Hodges was not telling the truth, rather, Logan was testifying about how he evaluates a person's response to his questions. Specifically, the State argued that Logan was stating

10

that memory lapses could be the result of confabulation or the person could be making up the memory lapse.

The district court did not believe that Logan was testifying about Hodges' credibility. Rather, the district court believed that Logan was explaining the concept of confabulation generally. However, the district court wanted to ensure that Logan did not comment on Hodges' credibility, so he denied Hodges' motion for a mistrial but granted a recess for the State to inform Logan of the importance of not commenting on Hodges' credibility.

When Logan interviewed Hodges, Hodges said he believed that if he was intoxicated at the time of the offense he would go "scott free." Logan believed that Hodges had fragmentary rather than embloc blackouts because he could recount some events in the bedroom that were accurate such as what J.O. smelled like. Hodges would not be able to recall this if he had suffered an embloc blackout.

Logan testified that alcohol consumption would not put impulses in a person's head that the person would not normally have but it would weaken the brain's ability to limit acting on the impulses. Blackouts do not affect these impulses, they only affect memory. Alcohol consumption does not prevent a person from forming intent. The person still intends to complete the action in which he or she is engaged. The alcohol consumption only affects the amount of wisdom a person has to refrain from acting on his or her impulses.

The jury convicted Hodges of one count of indecent liberties with a child on June 19, 2015. Hodges filed a motion for judgment of acquittal on June 25, 2014. Hodges argued that there was insufficient evidence to convict him of aggravated indecent liberties with a child beyond a reasonable doubt.

11

Hodges also filed a motion for a new trial on July 2, 2014. Hodges argued the court should grant him a new trial because the State did not prove he was guilty of aggravated indecent liberties with a child beyond a reasonable doubt, the district court erred when it did not grant Hodges a mistrial when Logan commented on his credibility, and the court also erred when it refused to instruct the jury on a lesser included offense of lewd and lascivious behavior.

The State filed a response to Hodges' motion for a new trial on July 9, 2014. The State argued that Hodges' motion should be denied because a jury unequivocally found Hodges guilty, Logan was explaining the scenarios he faces during an interview and was not commenting on the credibility of Hodges, the Pattern Instructions of Kansas make it clear that lewd and lascivious conduct is not a lesser included crime of aggravated indecent liberties with a child, and evidence about Hodges' mental capacity was not relevant.

The district court held a hearing on these two motions on August 14, 2014. At the hearing, Hodges reiterated the arguments made in his motions, and the State asked the court to deny Hodges' motions based on the arguments in the State's response. The district court addressed the motion for judgment of acquittal first and noted that based on the testimony, evidence, jury instructions, and verdict there was no indication that Hodges was not proven guilty beyond a reasonable doubt. Further, the evidence the district court heard indicated there was lewd fondling or touching. The district court also noted that the jury was presumed to have followed the instructions and each juror stated that he or she believed there was proof that Hodges was guilty beyond a reasonable doubt when the jury was polled. Based on this, the district court denied Hodges' motion for acquittal.

Next, the district court addressed Hodges' motion for a new trial. The district court adopted the ruling it made on Hodges' motion for a judgment of acquittal to reject his

12

argument that he was not proven guilty beyond a reasonable doubt. Second, the district court ruled that Logan's testimony was about the manner in which he conducts evaluations, how he evaluates whether the interviewee is being defensive, whether he believes the interviewee, and whether the interviewee is being truthful; it was not about Hodges' veracity or truthfulness.

Third, the district court affirmed its decision to not instruct the jury on lewd and lascivious conduct as a lesser included offense of aggravated indecent liberties because under the law and the facts of this case lewd and lascivious conduct was not a lesser included offense of aggravated indecent liberties. Finally, the district court affirmed its decision to limit testimony about Hodges' mental capacity because the issue at trial was whether Hodges was able to form the intent necessary, not a mental disease or defect defense. For these reasons, the district court denied Hodges' motion for a new trial.

The district court sentenced Hodges during the August 14, 2014, hearing. Hodges has a criminal history score of A. The district court sentenced Hodges to a term of life imprisonment with lifetime postrelease or parole supervision. Hodges was not eligible for parole for 25 years. The district court also informed Hodges that he was required to register as an offender under the Kansas Offender Registration Act.

Hodges appeals his conviction.

ANALYSIS

The only issue Hodges raises on appeal is whether the district court abused its discretion when it denied his motion for a mistrial. Specifically, Hodges contends that Logan should not have been allowed to make the following statement:

13

"There is [*sic*] a number of discrepancies between what others saw and what [Hodges] was telling me, and it could either be—it could be due to memory problems an alcoholic sometimes have [*sic*]. Sometimes they don't remember, a process called confabulation, or could be just not telling the truth about."

Hodges contends that by making this statement, Logan impermissibly commented on Hodges' veracity. The State responds that the district court did not abuse its discretion for two reasons:

1. Logan's testimony did not invade the province of the jury. Logan did not testify that Hodges was untruthful, that he did not believe Hodges, or that Hodges was guilty.

2. Logan did not offer his opinion that certain parts of Hodges' testimony were more believable than others or that another witness' testimony should be given more weight than Hodges' testimony.

Finally, the State argues that denying Hodges' motion for a mistrial was not fundamental error because any damage it may have caused was mitigated by the district court. The district court called a recess to allow the State to confer with Logan about the appropriate scope of his testimony. Logan then confined his testimony to appropriate topics.

This court uses an abuse of discretion standard to determine whether the district court erred in denying Hodges' motion for a mistrial and motion for a new trial. See *State v. Soto*, 301 Kan. 969, 977, 349 P.3d 1256 (2015). An abuse of discretion occurs when the district court's decision "'is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact. [Citation omitted.]'" 301 Kan. at 977 (quoting *State v. Clay*, 300 Kan. 401, 414, 329 P.3d 484 [2014]).

14

Hodges correctly contends that an expert witness may not comment on the credibility of a witness. *State v. Horton*, 300 Kan. 477, 487, 331 P.3d 752 (2014) (citing *State v. Bressman*, 236 Kan. 296, Syl. ¶¶ 3, 5, 689 P.2d 901 [1984]). For example, an expert witness for the State is not permitted to testify that the defense expert witness' theory is "hogwash." See *State v. Rodriguez*, 295 Kan. 1146, 1158-59, 289 P.3d 85 (2012).

However, an expert witness may provide an explanation of an interviewee's behavior during the expert's interview of that person. See *State v. Spurlock*, 30 Kan. App. 2d 921, 932, 52 P.3d 371, *rev. denied* 274 Kan. 1118 (2002). In *Spurlock*, the defendant was charged with rape and aggravated indecent liberties with his 6-year-old step-granddaughter K.B. K.B. was interviewed three times during the investigation. During the first two interviews, K.B. was forthcoming with her allegations. However, during the third interview, K.B. was reluctant to give details that she had previously provided.

At trial, the State called K.B.'s clinical social worker to testify. The social worker met with K.B. for therapy 18 times and was present during the third interview when K.B. was reluctant to provide details about the incidents. She testified that during the third interview K.B. stared into the air several times, did not answer the questions, and K.B. was disassociating. Spurlock objected, but the judge overruled the objection and allowed the social worker to testify that disassociation was a way for a person to block out things that are too stressful to deal with and this is common for child victims of sex abuse.

The Court of Appeals held that this testimony was admissible because the social worker "did not state she believed K.B. was sexually abused by Spurlock, and she did not render an opinion that K.B. was telling the truth." 30 Kan. App. 2d at 932. The court determined that her testimony "offered an explanation of K.B.'s behavior during the interview from the psychological point of view. 30 Kan. App. 2d at 932. Overall, the "testimony was not an impermissible comment on K.B.'s credibility but rather an opinion

15

intended to assist the jury in understanding the possible psychological consequences recognized and attributable to posttraumatic stress disorder." 30 Kan. App. 2d at 932.

This case is similar to *Spurlock* because Logan explained the possible causes of the discrepancies between Hodges' recollection of the incident and the recollections of other witnesses. Logan did not offer an opinion as to which of these possibilities existed in this case. Hodges told Logan what happened the day of the offense. At the end of this discussion, Logan noted, "There is [*sic*] a number of discrepancies between what others saw and what [Hodges] was telling me." Logan went on to provide possible reasons for these discrepancies, stating: "it could be due to memory problems an alcoholic sometimes have [*sic*]. Sometimes they don't remember, a process called confabulation, or could be just not telling the truth about."

Logan did not testify that he believed Hodges was guilty or that he believed Hodges was lying about blacking out during most of the incident. Logan's testimony only provided possible explanations for why Hodges' recollection of the evening of the offense did not match what other witnesses had said. As this court noted in *Spurlock*, providing such an explanation is not a comment on the witness' credibility. See 30 Kan. App. 2d at 932. Therefore, the district judge did not err when he denied Hodges' motion for a mistrial.

Affirmed.

16