No. 109,374

STATE OF KANSAS, *Appellee*, v. DOMINGO ALFREDO SOTO,
*Appellant*.
(349 P.3d 1256)

Opinion filed May 15, 2015.

*Michelle A. Davis*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Barry K. Disney*, assistant county attorney, argued the cause, and *Barry Wilkerson*, county attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

MALONE, J.: Domingo Soto appeals his jury trial convictions for aiding and abetting first-degree premeditated murder, possession of cocaine with intent to distribute, possession of methamphetamine with intent to distribute, and possession of marijuana. He argues the district court erred in denying his motion for new trial based on the State's failure to disclose the principal defendant would be available to testify and failing to give a lesser included intentional second-degree murder jury instruction. Finding no reversible error, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*The Killing of Steven Freel*

During the late morning hours of December 7, 2011, the corpse of Steven Freel was discovered on the edge of a dirt road in rural Riley County, Kansas. The cause of death was a gunshot wound to his chest, and it appeared the body had been there overnight. On the same day, Michael Blake Layne was established as a suspect in the fatal shooting.

In 2011, 19-year-old Layne worked for 41-year-old Domingo Soto at an equestrian center located in Riley County. Layne called Soto "Boss," and Soto was also known as "El Diablo." Soto lived in a trailer on the grounds and served as a caretaker for the property. Soto was also involved with distributing illegal drugs, specifically methamphetamine and marijuana. Soto would front marijuana to Layne who would later pay him back.

Freel and his girlfriend Nicole Langdon regularly purchased marijuana from Layne. In August 2011, Layne presumably committed a robbery with a gun he borrowed from Freel. In the ensuing investigation, Riley County Detective Ryan Runyan spoke with Layne and Freel about the armed robbery. Significantly, Detective Runyan informed Layne he knew Freel had provided him a gun for the robbery.

Subsequently in October or November 2011, Layne met Reyna Youdath, a college student who shared his interest in drugs. Layne introduced her to Soto, who would provide her with marijuana and methamphetamine at his house whenever she asked. On December 5, 2011, Layne asked Youdath to help him rob a girl who owed Soto from a previous drug transaction.

Around 3 a.m. on December 6, 2011, Layne, armed with a rifle, Youdath, and another individual robbed Nicole Autrey at her residence. They took a tattoo gun case, laptops, a black lock case, a cell phone, keys, an amplifier, and an Xbox. They returned to Layne's house. In the morning, Layne texted Soto: "Can I come out? I got shit for you. Very important shit." Later that morning, Youdath and Layne's girlfriend, Harley Boyden, dropped Layne off at Soto's house and Layne gave him Autrey's stolen items. You-

dath went back to her dorm, but she expected Layne to pick her up around 1 or 2 that afternoon to smoke methamphetamine.

In the early afternoon, Layne called Soto to tell him he wanted to kill Freel. Layne wanted to bring Freel over to Soto's residence to kill him with a .45 caliber pistol that Soto kept at his residence. At 2:56 p.m., Layne texted Soto: "I need him under boss please." Soto texted back: "W C EL. DiABlO." At about 3:06 p.m., Layne texted Soto back: "Let me do it boss." Thirty seconds later, Soto again responded: "W C EL. DiABlO."

Around the same time, Freel and his girlfriend Langdon drove to Layne's residence. Freel went inside to speak with Layne, and Langdon stayed in her car. Langdon thought Freel was just going inside to purchase marijuana. Layne's girlfriend, Boyden, testified that Freel seemed high on methamphetamine and kept begging Layne to help him find a gun because the police were after him. Freel came out to the car to ask Langdon for money to buy a gun. She refused, they argued about it, and ultimately they drove back to their own apartment.

Freel took a suitcase out of the trunk and started walking toward his own apartment when Layne pulled up behind their car. Freel leaned into Layne's passenger window, talked to him for a while, and then got in Layne's car. They pulled up next to Langdon who was still in her car. Freel told her he loved her, he would be right back, and everything was going to be okay. At 3:24 p.m., Youdath sent Layne a text saying she was waiting on him at her dorm.

Layne and Freel arrived at Soto's residence. Freel started talking, and Soto punched him in the face because Freel had "no idea what he's saying." Soto gave Layne the .45 pistol and told Layne "he didn't want this to happen on his property, and he didn't want to know anything about it." Layne and Freel left in Layne's vehicle.

At 3:46 p.m., Freel called Langdon and sounded irritated. He told her Layne and he were on their way back and asked if she could pick him up from Layne's house. She heard Layne in the background telling Freel to tell Langdon to "kiss his ass." Freel asked Layne if Langdon could pick him up from where they were out in the country. Layne refused, so Freel once again said he loved

her, they needed to go to Layne's, and they were on their way. That was the last time Langdon talked to Freel.

Sometime after 4 p.m., Layne arrived to pick up Youdath at her dorm. Youdath could tell something was wrong with him, and he told her that he "messed up real bad." He told her to reach under the seat. She complied and pulled out a black handgun. Youdath asked why he had the gun, and Layne told her that the guy he used to rob houses with "had his name in his mouth" and "he took care of it." Youdath asked for more details and Layne explained he took Freel to Soto's house where Soto punched him in the face and gave Layne a gun. Then Layne drove Freel to a dirt road, told him to get out, and shot him.

When Layne and Youdath arrived at Layne's residence, Langdon was parked out front in her car. Layne told her he dropped Freel off at his house or at Walmart. Later Layne drove Youdath and two of his friends out to see the body to prove that he had actually killed Freel. The time was around 5:30 p.m. Layne took Freel's backpack and put it in the car, and one of his friends took Freel's wallet.

Sometime around 9 p.m., Soto picked up Ashley Wright and drove her back to his trailer. Wright testified that Soto told her that "some stuff was going on, that he gave [Layne] his baby, and he was gonna shoot somebody." She knew Soto often referred to his gun as his "baby." Wright said she did not think Layne would do that, and Soto replied that he could tell if his gun had been fired.

After they arrived at the trailer, Layne called Soto and said he was on his way and was bringing the baby back. About 15 to 30 minutes later, Layne arrived and handed the gun to Soto. Soto did not touch the gun with his bare hands but used a bandana. Soto checked to see if it had been shot and then nodded his head yes to Wright. Soto asked Layne how he felt, and Layne replied that he felt numb. Soto patted him on the back and told him it would get better. Layne told Soto that he took Freel on the road, shot him, and left him there because "the guy had his name in his mouth."

The next morning, Freel's body was found on a dirt road in rural Riley County, Kansas, about 3.7 miles driving distance from Soto's residence. He was lying on his back with his arms stretched out. No evidence of a struggle was discovered. Likewise, nothing indicated the body had been moved or dragged from a vehicle. Underneath the body was a cell phone which showed the last dialed call was to Langdon at 3:46 p.m. on December 6.

Detective Runyan was assigned to investigate Freel's death. The first action by Runyan, who had previously spoken with Layne and Freel concerning an armed robbery in August 2011, was to find Layne. Officers located Layne; his girlfriend, Boyden; and Youdath. After interviewing Youdath, officers executed a search warrant of Soto's home. Soto was brought to the Riley County Police Department and was interviewed by Detective Runyan. Soto admitted that Layne had repeatedly asked if he could kill Freel, that he punched Freel when Layne brought him to Soto's residence, and that he gave Layne a .45 caliber pistol. However, he did not believe Layne had the guts to actually kill him.

Detective Runyan interviewed Layne on three occasions between December 7th and December 9th. During those interviews he told nine to eleven different versions of how the murder took place; however, none of them contradicted Soto's statements about what had happened.

A search of Layne's vehicle uncovered Freel's suitcase and jacket. A search of Layne's residence revealed a fired .45 caliber Winchester shell casing in the trash. A search of Soto's residence revealed eight identical unfired Winchester shell casings in Soto's bedroom. Under Soto's bed officers found a backpack which had a nylon holster with a loaded .45 caliber magazine. Additionally, officers found some of the items reported stolen from Autrey's residence; namely two computers, a case of compact disks, the tattoo kit, and the safe. No firearms were located in Soto's residence. Marijuana, cocaine, and methamphetamine were also recovered from Soto's residence.

*The Trial of Domingo Soto*

Layne and Soto were charged, along with other related crimes, with the first-degree premeditated murder of Freel. Layne was charged as the principal for shooting Freel, and Soto was charged as the aider and abettor for providing a handgun with knowledge that Layne intended to use it to kill Freel. The trials were separate, and Soto was tried first.

Prior to trial, the State moved to admit certain statements made by Layne as declarations against interest, an exception to the inadmissibility of hearsay under K.S.A. 2014 Supp. 60-460(j). Soto objected, arguing Layne's credibility was at issue and he was not available for cross-examination. The court granted the motion concerning Layne's incriminating statements to Youdath.

The jury trial proceeded, and, on the second day, Youdath was called as a witness. She testified that Layne and she robbed Nicole Autrey, that he took the stolen property to Soto, that Layne admitted to killing Freel, that he showed her the gun and the body, and that Layne took her to Soto's residence to return the gun.

Shortly after Youdath finished testifying, the court recessed for lunch. During the break, Layne's attorney and the State reached a plea agreement, but the prosecutor did not inform Soto's counsel. The trial proceeded, and Runyan testified about his interrogation of Soto. Soto admitted that on December 6, Layne called to say he wanted to kill Freel, that Layne wanted to use Soto's .45 caliber pistol, that Layne brought Freel to Soto's residence, that Soto hit Freel, and that Soto gave Layne the pistol with instructions "[h]e didn't want anything to occur on his property and he didn't want to know anything about this." Layne then drove Freel away from Soto's property. Layne called to tell Soto that he had killed Freel, and later that evening Layne came back to Soto's residence to return the pistol. Soto told the detective that he no longer had the pistol. Soto also told Runyan that he didn't think Layne would kill Freel because he didn't think Layne "would have the guts."

At the end of the trial, the State submitted proposed jury instructions for first- degree murder, second-degree intentional murder, and voluntary manslaughter. However, the court questioned

whether the facts justified the lesser included instructions. Soto's attorney and the prosecutor agreed with the district court, so the jury was not instructed on the lesser included offense of intentional second-degree murder.

The jury convicted Soto of aiding and abetting first-degree murder, possession of marijuana, possession with intent to distribute cocaine, and possession with the intent to distribute methamphetamine; he was acquitted on two other charges.

After the trial, Soto's counsel learned of Layne's plea agreement, which precipitated a motion for a new trial. Soto argued the State should have informed defense counsel of the plea agreement, and justice required a new trial so Soto "can have an opportunity to confront one of his primary accusers, that being the co-defendant, the person who shot Mr. Freel." Defense counsel did not proffer what Layne's testimony would be at a new trial. The court denied Soto's motion for a new trial, and he was sentenced to a controlling hard 25 life sentence.

Layne pleaded guilty to second-degree murder after Soto was convicted. Then, 3 days after Soto was sentenced, Layne was sentenced to an aggravated term of 165 months' imprisonment.

Soto timely appeals the denial of his motion for a new trial.

### DID THE TRIAL COURT ERR IN DENYING A NEW TRIAL DUE TO THE STATE'S FAILURE TO DISCLOSE THE PLEA AGREEMENT WITH THE CODEFENDANT?

*Standard of Review*

A district court should grant a defendant's request for a new trial when doing so is in the interest of justice under K.S.A. 2014 Supp. 22-3501. A district court's ruling on a motion for new trial is reviewed for an abuse of discretion. "A district court abuses its discretion when the action is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact. [Citation omitted.]" *State v. Clay*, 300 Kan. 401, 414, 329 P.3d 484 (2014).

At the new trial hearing, defense counsel argued that Layne would be available to testify at Soto's trial in 4 to 6 weeks after he pleaded and was sentenced. Defense counsel argued the prose-

cution should have disclosed the plea agreement, even if it created delay and inconvenience, because Soto's confrontation rights were violated by not being able to confront Layne.

The prosecutor countered that Layne's statements were admitted as declarations against interest and had nothing to do with Layne's availability. He argued defense counsel never attempted to call Layne at trial, and defense counsel was allowed to ask Detective Runyan about Layne's multiple versions of events. The prosecutor admitted plea negotiations with Layne's counsel were tentatively reached during Soto's trial but failed to understand how that had anything to do with Soto's case.

*Analysis*

On appeal, Soto argues the State's decision to withhold information during trial that it had reached a plea deal with Layne, which changed Layne's status from unavailable to available, infringed upon Soto's right to due process and a fair trial. See *State v. Sherry*, 233 Kan. 920, 930, 667 P.2d 367 (1983) ("A basic requirement of due process is the right to a fair trial in a fair tribunal."). The State counters that Layne's tentative plea agreement was neither favorable to Soto nor material to Soto's trial.

A prosecutor's suppression of evidence favorable to the accused is a violation of a defendant's due process rights under the Fourteenth Amendment to the United States Constitution. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). The three components of a *Brady* violation claim are: "(1) The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be material so as to establish prejudice." *State v. Warrior*, 294 Kan. 484, Syl. ¶ 10, 277 P.3d 1111 (2012).

Under the first prong, "[e]vidence that is favorable to the accused encompasses both exculpatory and impeachment evidence. For *Brady* purposes, there is no distinction between these two types of evidence that are favorable to the accused; thus, impeachment evidence is considered exculpatory." *Warrior*, 294 Kan. 484, Syl. ¶ 9.

Soto argues Layne emerged as a potential witness in Soto's trial when he agreed to the terms of a plea agreement. With this knowledge, he contends defense counsel could have proceeded "in a manner consistent with Mr. Soto's interests." The defense thus never had an opportunity to question Layne regarding his incriminating statements to Youdath nor impeach Layne regarding the multiple versions of events he relayed to Detective Runyan. The State responds that even if Layne was available to testify at trial, Soto has proffered nothing to establish that Layne's testimony would have countered any material fact or otherwise been favorable to Soto.

Indeed, on cross-examination, Detective Runyan acknowledged that nothing Layne said contradicted Soto's statements that (1) Layne had been involved in some robberies; (2) Layne called Soto and said there was a guy bothering him and asked to take him to Soto's residence; (3) Layne told him he wanted to kill this guy; (4) Layne wanted to borrow his .45 gun; (5) Soto punched the guy; (6) Soto gave Layne the gun; (7) Soto told Layne to go because he did not want to know anything or have anything happen on his property.

However, this does not address the events of the actual shooting. Only one version was presented at trial: Youdath testified that Layne said he took the guy to a dirt road, told him to get out, the guy knew Layne was going to kill him, and Layne shot him. As Layne gave multiple versions of events, the ability to impeach a codefendant would arguably be favorable to Soto *if* he would have been available for trial.

Under the second prong, "prosecutors have a positive duty to disclose evidence favorable to the accused when 'the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' " *Warrior*, 294 Kan. at 505-06 (quoting *Brady*, 373 U.S. at 87). In this case, it is undisputed the prosecutor did not disclose the terms of the agreement on the second day of Soto's trial. Assuming the undisclosed information was favorable to Soto by creating an opportunity for impeachment evidence, the third prong of the *Brady* test—the prejudicial effect

on Soto's ability to defend against the charges—needs to be considered.

Under the third prong, "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Warrior*, 294 Kan. 484, Syl. ¶ 11.

Soto summarily contends his conviction must be reversed because the State cannot meet this standard, while the State offers several persuasive reasons why Layne's plea agreement was not material to Soto's trial.

First, the State argues the fact that terms of a plea agreement had been reached is not material because it did not make Layne available as a witness during the 3-day jury trial that ended on October 31, 2012. Indeed, Layne entered his plea on November 6, 2012, and he was sentenced on December 20, 2012. " 'The privilege against self-incrimination ends *after sentence is imposed* where a plea of guilty has been regularly accepted by the court, and *no motion is made to withdraw it.*' " (Emphasis added.) *State v. Bailey*, 292 Kan. 449, 460, 255 P.3d 19 (2011) (quoting *State v. Longbardi*, 243 Kan. 404 Syl. ¶ 1, 756 P.2d 1098 [1988]). Accordingly, the earliest Layne would have been available to testify would have been 50 days after the conclusion of Soto's trial.

Second, the State correctly points out that while Layne agreed to the terms of the plea agreement during Soto's trial, he was not contractually bound to enter the plea that had been negotiated between his and the State's attorneys. Even if this information had been disclosed, no reasonable person would have delayed the trial indefinitely or granted a mistrial based on a *possibility* that Layne would enter a plea. K.S.A. 22-3423(1) sets forth the reasons for a mistrial:

"(a) It is physically impossible to proceed with the trial in conformity with law; or

"(b) There is a legal defect in the proceedings which would make any judgment entered upon a verdict reversible as a matter of law and the defendant requests or consents to the declaration of a mistrial; or

"(c) Prejudicial conduct, in or outside the courtroom, makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution; or

"(d) The jury is unable to agree upon a verdict; or

"(e) False statements of a juror on *voir dire* prevent a fair trial; or

"(f) The trial has been interrupted pending a determination of the defendant's competency to stand trial."

Although Soto argues that a "delay" or "inconvenience" was necessary for him to confront Layne, Soto does not argue that any of these reasons for mistrial would have been applicable in his case. In fact, defense counsel specifically stated he was not alleging prosecutorial misconduct at the hearing and did not assert prejudice with the timing of the plea negotiations to coordinate with Soto's trial. Accordingly, a reasonable probability exists disclosure of the plea agreement to defense counsel would have the same result, *i.e.*, Soto's trial would not have been delayed or declared a mistrial.

Finally, the fact that Layne might enter a plea on some unspecified date in the future would not have affected the admissibility of Layne's incriminating statements at trial, which were admitted as declarations against interest under K.S.A. 2014 Supp. 60-460(j):

"Subject to the limitations of exception (f), a statement which the judge finds was at the time of the assertion so far contrary to the declarant's pecuniary or proprietary interest or so far subjected the declarant to civil or criminal liability or so far rendered invalid a claim by the declarant against another or created such risk of making the declarant an object of hatred, ridicule or social disapproval in the community that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true."

A declarant need not be unavailable in order to admit a hearsay statement as a declaration against interest. *State v. Jackson*, 244 Kan. 621, 624, 772 P.2d 747 (1989). Accordingly, a reasonable probability exists that even if Layne was available at trial, his admission to Youdath that he had killed Freel and description of the murder's surrounding circumstances would still have been admissible at trial.

In summary, Layne's entry into a plea agreement on the second day of Soto's trial was not material because it would not have changed the course of the trial. Layne was not obligated to enter a plea despite the plea agreement. The district court in Soto's trial

would not have been legally required to delay the trial indefinitely or grant a mistrial based on the possibility that Layne would enter a plea and be sentenced sometime in the future. Also, Layne's incriminating statements to Youdath would still be admissible as declarations against interest regardless of Layne's availability at trial.

Moreover, even if Soto's trial had been delayed and Layne was able to testify, it is unlikely Soto's attempts to impeach his testimony would have any effect on the outcome of the trial. Significantly, Youdath testified that Layne admitted to killing Freel with Soto's gun, that Layne took her to see the body, and that she went with him to Soto's residence to return the gun. Soto admitted to Detective Runyan that Layne repeatedly asked if he could kill Freel, that Soto punched Freel, that he gave Layne a gun, and that Soto told Layne not to do anything on his property. The remaining testimony, text messages, and physical evidence recovered from Layne and Soto's residences and Layne's car, *i.e.*, matching .45 shell casings, stolen property, drugs, and Freel's suitcase and jacket, all corroborated Youdath and Soto's statements.

Further, in moving for a new trial, no proffer was made as to what Layne's testimony would be if he was called as a witness. Assuming Layne would have testified, it is unlikely that his testimony would have been helpful to Soto's defense.

In light of this overwhelming evidence, no reasonable probability exists the outcome of Soto's trial would have changed even if Layne testified. Accordingly, we hold the district court did not abuse its discretion in denying Soto's motion for new trial.

## DID DEFENSE COUNSEL INVITE ERROR BY FAILING TO REQUEST A SECOND-DEGREE MURDER INSTRUCTION?

The State submitted proposed jury instructions for first-degree murder, second- degree intentional murder, and voluntary manslaughter. While reviewing the proposed instructions, the district court stated there was no evidence that would justify giving the jury lesser included instructions on the first-degree murder charge. Defense counsel and the prosecutor agreed, and no lesser included

instructions were given to the jury on the first-degree murder charge.

As the State was proceeding under an aiding and abetting theory, the jury was instructed in part: "To establish guilt on the basis of aiding and abetting a defendant must intentionally associate with the unlawful venture and participated in such a way as to indicate that he was facilitating the success of the venture." The jury was instructed that in order to establish the charge of first-degree murder, it had to prove:

"1. That Steven Freel was intentionally killed.

"2. The killing was done with premeditation.

"3. That the defendant intentionally associated with the killing and participated in such a way as to indicate that he was facilitating the success of the killing by providing a handgun to Blake Layne with knowledge that Layne intended to use the handgun to kill Steven Freel.

"4. This act occurred on or about the 6th day of December, 2011 in Riley County, Kansas.

"As used in this instruction, the term 'premeditation' means to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life."

Soto argues for the first time on appeal that the district court's failure to instruct on intentional second-degree murder was clearly erroneous. The State counters the doctrine of invited error precludes consideration of the issue on appeal.

*Invited Error Doctrine*

The doctrine of invited error precludes a party from asking a district court to rule a given way and thereafter challenging the court's ruling on appeal. *State v. Jones*, 295 Kan. 804, 813, 286 P.3d 562 (2012).

In support of its argument, the State relies on *State v. Angelo*, 287 Kan. 262, 197 P.3d 337 (2008), where the district court determined that a second-degree murder instruction was factually appropriate but acceded to the defendant's two requests that the instruction not be given. This court declined to consider the defendant's appeal on this issue under the doctrine of invited error.

287 Kan. at 280. The State also argues invited error has been found to be applicable when defense counsel simply declined a lesser included offense even without positive argument against the instruction. See *State v. Hernandez*, 44 Kan. App. 2d 524, 527-28, 239 P.3d 103 (2010), *rev. denied* 294 Kan. 945 (2012); but see *Clay*, 300 Kan. at 409-10 (declining to apply invited error analysis where defense counsel chose between two instructions and record unclear as to rationale and who requested them).

The facts of this case are distinguishable from *Angelo* and *Hernandez*. Here, defense counsel made no affirmative request to omit a second-degree murder instruction nor did defense counsel decline an offer by the court to give the instruction. A second-degree murder instruction was requested by the State and not objected to by defense counsel. The court had initially included the second-degree murder instruction in a set of proposed instructions given to each side. At the instruction review conference, the district court considered the evidence presented at trial and concluded there were not "any facts which would justify" a lesser included instruction of second-degree murder. Defense counsel acquiesced to the trial judge's ruling rather than requested the instruction not be given. Under these facts, we decline to apply the invited error rule.

## Was the Trial Court's Failure to Instruct on Intentional Second-Degree Murder Clearly Erroneous?

The State's alternative argument is that an intentional second-degree murder instruction was not factually justified.

### Standard of Review

"Second-degree intentional murder is a lesser degree of homicide than first-degree premeditated murder and thus, if sufficient evidence of all of the elements of the greater offense has been presented by the State, an instruction on the lesser is legally and factually appropriate and should be given by the district judge. However, when a defendant challenges the judge's failure to give the lesser included offense instruction for the first time on appeal, the defendant must demonstrate that the failure was clearly erroneous, *i.e.*, the defendant must firmly convince the appellate court that the giving of the instruction would have made a difference in the verdict." *State v. Haberlein*, 296 Kan. 195, Syl. ¶ 1, 290 P.3d 640 (2012), *cert. denied* 134 S. Ct. 148 (2013).

*Analysis*

While we decline to apply the doctrine of invited error, we recognize that Soto did not object to the exclusion of the intentional second-degree murder instruction he now argues should have been given. This failure to object requires us to apply the standard of clear error.

Soto relies primarily upon *Haberlein* in support of his argument. In *Haberlein*, a codefendant testified that during the course of a robbery, Haberlein announced something more serious was going to happen; he shot the store worker, chased after her when she tried to escape, brought her back into the store, beat her with various items, and finally shot her again. Haberlein was charged with premeditated first-degree murder, but he did not seek a lesser included second-degree murder instruction nor object to its omission at trial. On appeal, this court engaged in a detailed analysis of the proper standard of review to utilize. First, it noted the following standard of review:

" '(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless.' " 296 Kan. at 203 (quoting *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 [2012]).

To determine whether the failure to give an instruction was clearly erroneous, "the reviewing court necessarily has to first determine whether it was erroneous at all." 296 Kan. at 203. If error exists, the reviewing court engages in a reversibility inquiry. The burden to show clear error under K.S.A. 2014 Supp. 22-3414(3) remains on the defendant. 296 Kan. at 203-04.

The *Haberlein* court first found the instruction was legally appropriate because intentional second-degree murder is a lesser included offense of premeditated first-degree murder. 296 Kan. at 204; see K.S.A. 21-3401(a) (defining first-degree premeditated murder as the killing of a human being committed intentionally

and with premeditation); K.S.A. 21-3402(a) (second-degree intentional murder is the killing of a human being committed intentionally; no premeditation is required).

Next, this court considered whether an instruction for second-degree intentional murder was factually supported on the record before it. It reasoned in relevant part:

"While the evidence of premeditation in this case was extremely strong, there also was at least some evidence of each of the other elements of first-degree premeditated murder, and these elements are identical to the elements of second-degree intentional murder. Thus, at least in theory, the jury could have chosen to convict Haberlein of second-degree intentional murder without having its verdict subject to reversal for insufficient evidence. This means the instruction was factually supported." 296 Kan. at 204.

As the instruction was factually and legally supported, this court found the district court erred in not giving it. See K.S.A. 2014 Supp. 22-3414(3) (judge shall give instruction on lesser included crime when some evidence would reasonably justify conviction). The *Haberlein* court went on to conduct the clearly erroneous analysis. 296 Kan. at 204.

In this case, the State concedes the instruction was legally appropriate. Where the parties differ is, viewing the evidence in the light most favorable to the defense, if the instruction is factually supported. Soto argues the record contains at least some evidence that would reasonably justify a conviction for intentional second-degree murder. The State argues there is no evidence to support the lesser instruction and what Soto calls evidence is purely hypothesis. The evidence on the day of Freel's death needs to be reviewed in a light most favorable to Soto, and because Soto was convicted of aiding and abetting Layne in the premeditated murder of Freel, the evidence surrounding Freel's death needs to be considered.

Freel's girlfriend, Langdon, testified to her being with Freel and Layne on the day Freel was shot. Summarized, she explained she drove Freel to Layne's house to buy marijuana and that Freel alone stayed in Layne's house for about 20 minutes. Later, Layne met them outside her apartment and that Freel and Layne left together. She further testified about her last phone conversation with Freel

in which Layne voluntarily participated by insulting her shortly before Freel was shot. Layne clearly made no attempt to hide the fact that he was alone with Freel multiple times on the day of the shooting and right before the shooting itself. This course of conduct, *i.e.*, identifying yourself as the sole person alone with the murder victim shortly before the killing, would seemingly be counterintuitive to one premeditating a murder. See *State v. Kettler*, 299 Kan. 448, 467-69, 325 P.3d 1075 (2014) (course of conduct before and after killing provides circumstantial evidence of premeditation).

In addition, Youdath testified that Layne told her he took the guy to a dirt road, told him to get out, and shot him. Detective Runyan testified that Layne told at least eleven different versions of how Freel died, but neither party inquired into the specifics of these versions. Various witnesses, including Soto, testified that they did not believe Layne would actually kill Freel. Soto contends the jury was left with uncertainty as to what had actually happened and may have returned a verdict for the lesser offense of an intentional killing.

The State counters that none of Layne's version of events contradicted Soto's statements to the detective that (1) Layne had been involved in some robberies; (2) Layne called Soto and said there was a guy bothering him and asked to take him to Soto's residence; (3) Layne told him he wanted to kill this guy; (4) Layne wanted to borrow his .45 revolver; (5) Soto told the guy to shut the fuck up and punched the guy twice; (6) Soto gave Layne the gun; (7) Soto told Layne to go because he did not want to know anything or have anything happen on his property. The district court commented on this, stating that it did not hear any facts which would justify heat of passion, second-degree murder, or manslaughter instructions.

The State argues that "[i]f *Haberlein* is read as literal[ly] as Soto contends then there is no longer a need to look at the facts of a particular case in determining whether to give a lesser" as required by our previous caselaw. See, *e.g.*, *State v. Plummer*, 295 Kan. 156, 161, 283 P.3d 202 (2012) ("[E]ven if the instruction is legally ap-

propriate when viewed in isolation, it must be supported by the particular facts of the case at bar.").

While a similar argument was noted in the *Haberlein* dissent, we did consider the particular facts of the case in *Haberlein* in concluding that although evidence of premeditation was strong, there was still evidence of each of the facts of intentional second-degree murder *presented at trial*. 296 Kan. at 204.

Likewise in this case, the evidence of premeditation was overwhelming, but there are some inferences which could have been drawn by a factfinder to conclude the shooting on the dirt road was intended but not premeditated. Langdon's testimony about her last phone conversation with Freel, in which Layne voluntarily participated, and Youdath's testimony regarding the shooting itself, provides at least some evidence of the elements of intentional second-degree murder. Finally, as discussed more below, the direct evidence of Soto's giving his gun to Layne while indicating he did not believe Layne would have the guts to kill Freel, militates against a premeditated act by Soto. Applying *Haberlein* to this case, the intentional second-degree murder instruction was legally and factually supported and should have been given by the district court. See K.S.A. 2014 Supp. 22-3414(3); *Haberlein*, 296 Kan. at 204.

The next step is to determine whether the failure to give the unrequested instruction was clearly erroneous. The State argues that even if the district court should have given an intentional second-degree murder instruction, Soto cannot meet his burden to establish the jury would have convicted him of second-degree murder. The State reasons the evidence was uncontested that Soto provided the murder weapon to Layne and that Layne planned to kill Freel.

The State continues that because Soto was acting as an aider and abettor, the only contested issue was whether Soto acted with premeditation. See *State v. Lopez*, 299 Kan. 324, 331, 323 P.3d 1260 (2014) ("even on an aiding and abetting theory of criminal responsibility, the State must prove that the defendant 'possessed the specific intent of premeditation in order to convict [the defendant] of first-degree murder' "). Premeditation means to have thought

the matter over beforehand and does not necessarily mean an act is planned, contrived, or schemed beforehand; rather, premeditation indicates ·a time of reflection or deliberation. *State v. Qualls*, 297 Kan. 61, Syl. ¶ 2, 298 P.3d 311 (2013). The State submits that because Soto handed Layne the gun knowing Layne wanted to kill Freel, there is no question he shared in the requisite premeditation.

Soto's defense to premeditation at trial was to elicit testimony from several witnesses that they did not believe Layne would kill someone and that he would show off and claim to have done things he had not done. With this common belief, Soto told Detective Runyan that he gave Layne the gun but did not believe Layne had the guts to kill Freel despite what he had said.

Although this case is filled with direct evidence of premeditation, application of the circumstantial evidence factors to Soto gives rise to a strong inference of premeditation as well:

" '(1) the nature of the weapon used; (2) lack of provocation; (3) the defendant's conduct before and after the killing; (4) threats and declarations of the defendant before and during the occurrence; and (5) the dealing of lethal blows after the deceased was felled and rendered helpless. [Citation omitted.]' " *Kettler*, 299 Kan. at 467 (quoting *State v. Scaife*, 286 Kan. 614, 617-18, 186 P.3d 755 [2008]).

Soto punched Freel based on something Freel said or how he said it and gave Layne a gun with orders not to do anything on his property. Soto knew Layne had been asking to kill Freel all day long. Soto drove around during the killing and told Wright that Layne was going to shoot someone with his gun. When Layne returned the gun, Soto nodded and comforted Layne that it would get better. Despite Soto's claims that he did not believe Layne would shoot Freel, both the direct and circumstantial evidence clearly established evidence that Soto acted with premeditation. Compare *State v. Williams*, 299 Kan. 509, 528, 324 P.3d 1078 (2014) (finding defendant who claimed to be an innocent driver premeditated the murder as an aider and abettor where he knew what codefendants were going to do when entering the house and provided the gun).

Due to the overwhelming amount of evidence that Soto acted with premeditation, he has failed to firmly convince us that the jury

would have found him guilty of aiding and abetting intentional second-degree murder if the lesser included instruction had been given. See *State v. Betancourt*, 299 Kan. 131, 135, 322 P.3d 353 (2014). Thus the district court's failure to give the unrequested lesser included instruction was not clearly erroneous.

The judgment of the district court is affirmed.

MICHAEL J. MALONE, Senior Judge, assigned.

* * *

ROSEN, J., concurring in part and dissenting in part: I concur with the majority's conclusions affirming Soto's convictions. However, K.S.A. 2014 Supp. 22-3414(3) provides: "[W]here there is some evidence which would reasonably justify a conviction of some lesser included crime . . . the judge shall instruct the jury as to the crime charged and any such lesser included crime." Here, even the party offering the instruction agrees and Soto does not contest that the district court properly applied the statute when it concluded that there was no evidence that would reasonably justify a conviction of the requested lesser included offense. I would simply find on this record and consistent with my dissenting opinions in *State v. Qualls*, 297 Kan. 61, 73, 298 P.3d 311 (2013) (Rosen, J., dissenting); *State v. Haberlein*, 296 Kan. 195, 213, 290 P.3d 640 (2012) (Rosen, J., dissenting); *State v. Tahah*, 293 Kan. 267, 280, 262 P.3d 1045 (2011) (Rosen, J., dissenting); and *State v. Scaife*, 286 Kan. 614, 627-31, 186 P.3d 755 (2008) (Rosen, J., dissenting), that the trial court did not err in failing to instruct the jury on the lesser included offense.