NOT DESIGNATED FOR PUBLICATION

No. 120,064

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

STEVEN ANTHONY HARRIS,
*Appellant*.

MEMORANDUM OPINION

Appeal from Riley District Court; MERYL D. WILSON, judge. Opinion filed September 13, 2019. Affirmed.

*Christina M. Kerls*, of Kansas Appellate Defender Office, for appellant.

*Barry K. Disney*, senior deputy county attorney, *Barry R. Wilkerson*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before POWELL, P.J., GARDNER, J., and LAHEY, S.J.

PER CURIAM: Steven Anthony Harris was charged with first-degree murder, attempted first-degree murder, and felony possession of a firearm. The jury found him guilty of second-degree murder, attempted second-degree murder, and felony possession of a firearm. Harris appeals his convictions, arguing that the district court erred by: (1) instructing the jury on the lesser included offenses of second-degree murder and attempted second-degree murder; and (2) prohibiting questioning about the lead detective's allegedly faulty investigative tactics in another case. Harris also argues that we

1

should reverse due to cumulative error and that the district court improperly used his criminal history score to increase his sentence. Finding no error, we affirm.

*Factual and Procedural Background*

In spring 2017, German Garcia was building a new house for his family. Garcia hired Jake Fechner to do concrete work and Adrian Ortega to install tile. Ortega brought Harris to Garcia's house to work as his assistant. A shooting there on May 21, 2017, led police to arrest and charge Harris with first-degree murder, attempted first-degree murder, criminal possession of a firearm, and violation of the Kansas Offender Registration Act (KORA).

That day, Garcia had become upset with Ortega and Harris for doing a poor job tiling and for tracking mud into his house. Eventually, Harris, who was holding a hatchet, and Garcia argued with one another in Spanish. The record does not reflect what they said. Ortega broke up the argument and Harris later apologized to Garcia. Fechner later heard Harris say that he "wasn't going to be disrespected." Fechner did not know who Harris was talking about and felt that Harris' apology had dissipated any problems between Harris and Garcia.

Shortly before 6 p.m., Fechner left work for the day. At that time, Ortega was working inside and Garcia was working outside, unloading lumber from a truck and stacking it in his front yard. Harris was sitting in his white Ford pickup parked behind Fechner's vehicle.

Around the time Fechner left Garcia's house, Ryan Nuessen, Garcia's neighbor from across the street, heard two "loud pops." Nuessen looked outside and saw a man in Garcia's yard, holding a gun. Nuessen described the gun as a "black semi auto pistol, . . similar to [] a service weapon that a police officer would carry." He described the

2

gunman as being around six feet tall, two hundred or so pounds, in good physical shape but not "overly muscular," and with a "bald haircut"—"not . . . razor thin but . . . a no guard clipper cut bald." Nuessen could see the back but not the front of the gunman's head.

Nuessen then saw Ortega come out of Garcia's house, saw the gunman point the pistol at Ortega, and heard another round of loud shots. Ortega ran around Garcia's house but the gunman chased him, and Nuessen then heard a third round of shots. Nuessen quickly called 911. While on the phone, Nuessen saw the shooter come around Garcia's house, walk down Garcia's driveway, and go to "one of the two white trucks from [Garcia's driveway]." Nuessen specified that the shooter left in "a white Ford," not the white Chevy.

A second neighbor also heard gunshots coming from Garcia's house. Steve Anderson was playing video games on his computer when the incident occurred. After Anderson realized the sounds were too loud to be coming from his game, he looked out his window and saw a man walking down Garcia's driveway toward a white truck, carrying something. Anderson recognized him as a worker from Garcia's house whom Anderson had previously approached about parking in his yard. Anderson noted that the man had a "187" tattooed on his neck. The man got in a white truck, backed out of the driveway, and headed north on Nelson's Landing Road.

Once the truck was gone, Anderson noticed another man (Ortega) come from behind Garcia's house and look in the direction the truck had driven. Ortega was injured and bleeding. Anderson also noticed that Garcia was injured and "twitching" on the ground.

A third neighbor also heard shots. Steve Horton, a retired military gun chief, lived two doors north of Garcia. Upon hearing shots, Horton immediately identified them as

3

coming from a 9 mm gun. Horton saw a white truck leaving Garcia's driveway, heading north on Nelson's Landing Road. Then, Horton noticed two wounded victims at Garcia's house and called 911. While on the phone, Horton saw the truck turn around and head south on Nelson's Landing Road. Horton then noted the vehicle was a white 1990s or 2000 Ford F150 truck, with rust on the lower rocker panels underneath the door. Horton saw that the truck had only one occupant—the driver. He described that person as "either white or Hispanic, a light—light skin, and had on a light-colored or a white t-shirt. . . . And [his] hair was real short. . . . [I]t was just a buzz cut." In his 911 call, Horton stated that the driver had a lot of tattoos.

Police were sent to Garcia's house. On the way there, Sargent Ryan Doehling saw a white F150 truck with only one occupant but did not stop it. Once Doehling arrived, he found Ortega with bullet wounds to his arm and face and found Garcia dead on the ground. Garcia had been shot in his back and arm. In Garcia's yard, police located 11 spent rounds of shell casings from a 9 mm pistol. Harris was not there.

Police went to Harris' house and found Harris' truck but not Harris. Also gone was Harris' girlfriend and her vehicle. Police found Harris' girlfriend's vehicle about two hours after the shooting. But not until four days later, on May 25, 2017, did they locate Harris and his girlfriend. They were in a motel in Wichita. Harris had three firearms in his possession. One of them was a Smith and Wesson 9 mm pistol. Police determined that the shell casings found in Garcia's yard had been fired from that pistol.

The State charged Harris with first-degree murder, attempted first-degree murder, criminal possession of a firearm, and violation of KORA. After the State rested, the district court granted Harris' motion for judgment of acquittal on the KORA violation charge. Ortega left town at some point, could not be found, and did not testify at trial.

At trial, Harris' defense counsel attacked the completeness of the investigation, focusing on the fact that no one had clearly identified Harris as the shooter. The defense theory was that someone else shot the victims and then left on a red minibike. Harris had picked up the gun merely to protect himself after the real assailant had dropped it. Nonetheless, the jury convicted Harris of the lesser included offenses of second-degree murder of Garcia, attempted second-degree murder of Ortega, and criminal possession of a firearm. Harris, sentenced to 687 months in prison, appeals, raising four issues.

*Did the District Court Err in Instructing the Jury on the Lesser Included Offenses of Second-degree Murder and Attempted Second-degree Murder?*

We first address Harris' argument that the district court erred in instructing the jury on the lesser included offenses of second-degree murder and attempted second-degree murder.

"When analyzing jury instruction issues, we follow a three-step process: '(1) determining whether the appellate court can or should review the issue, *i.e.*, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits of the claim to determine whether error occurred below; and (3) assessing whether the error requires reversal, *i.e.*, whether the error can be deemed harmless.' [Citation omitted.]" *State v. McLinn*, 307 Kan. 307, 317, 409 P.3d 1 (2018). Whether a party has preserved a jury instruction issue affects the appellate court's reversibility inquiry at the third step. 307 Kan. at 317.

First, we find this issue is reviewable. As the State admits, Harris objected at trial to the jury instructions about lesser included offenses.

In the second step of the analysis, we consider whether the instructions were legally and factually appropriate, employing an unlimited review of the entire record.

5

*McLinn*, 307 Kan. at 318. Harris concedes that the instructions were legally appropriate, and we agree. As relevant here, K.S.A. 2018 Supp. 21-5402(a)(1) defines first-degree premeditated murder as the killing of a human being committed intentionally and with premeditation. In contrast, second-degree intentional murder is the killing of a human being committed intentionally; no premeditation is required. K.S.A. 2018 Supp. 21-5403(a)(1). The instructions about which Harris complains were legally appropriate, because second-degree intentional murder is a lesser included offense of first-degree premeditated murder. See *State v. Louis*, 305 Kan. 453, 458, 384 P.3d 1 (2016) (recognizing attempted intentional second-degree murder instruction as legally appropriate in attempted first-degree murder case); *State v. Soto*, 301 Kan. 969, 985, 349 P.3d 1256 (2015) (instruction for intentional second-degree murder is a lesser included offense of premediated first-degree murder).

The parties dispute, however, whether the instruction for second-degree intentional murder was factually supported. Harris argues that the instructions for second-degree murder and attempted second-degree murder were not factually appropriate "given the overwhelming and undisputed evidence of premeditation." Yet under K.S.A. 2018 Supp. 22-3414(3), the district court is required to instruct on lesser included crimes when some evidence would reasonably justify a conviction of the lesser included crime. That is the case here.

Our Supreme Court has listed some circumstantial factors that tend to show premeditation. *State v. Scott*, 271 Kan. 103, 109, 21 P.2d 516 (2001). These include: "(1) the nature of the weapon used, (2) the lack of provocation, (3) the defendant's conduct before and after the killing, (4) threats and declarations of the defendant before and during the occurrence, or (5) the dealing of lethal blows after the deceased was felled and rendered helpless." 271 Kan. at 109. The State argues that most of these factors are not shown by the evidence here, so the jury had grounds to find that Harris' actions were

6

intentional yet not premeditated. For example, Harris did not continue to shoot Garcia after he was down.

Yet Harris did use a deadly weapon. But premeditation should not be inferred from the use of a deadly weapon alone. See *State v. Henson*, 221 Kan. 635, 639, 562 P.2d 51 (1977). And the fourth factor—threats—may arguably be shown here because Fechner heard Harris say several hours before the shooting that he "wasn't going to be disrespected." But that statement was not a clear threat to either victim and must be considered in conjunction with the remaining evidence.

The remaining evidence provides some support for the jury to find that Harris' actions were intentional yet were not premeditated. First, Fechner testified that after Harris apologized to Garcia, he thought everything was fine between them and that the altercation had ended. This evidences a lack of premeditation. Also, the three men worked after the argument without further altercation, confirming that impression. So Harris' conduct for several hours after the argument and before the shooting was apparently normal.

More importantly, our Supreme Court has found that an instruction for second-degree murder is factually appropriate in cases with strong and even overwhelming evidence of premeditation. See *Soto*, 301 Kan. at 970-71; *State v. Haberlein*, 296 Kan. 195, 204, 290 P.3d 640 (2012). Providing evidence of premeditation does not necessarily make it inappropriate to instruct on the lesser included offenses of second-degree murder and attempted second-degree murder. This is true even if the evidence of premeditation is strong or overwhelming.

> "While the evidence of premeditation in this case was extremely strong, there also was at least some evidence of each of the other elements of first-degree premeditated murder, and these elements are identical to the elements of second-degree intentional murder.

> Thus, at least in theory, the jury could have chosen to convict Haberlein of second-degree intentional murder without having its verdict subject to reversal for insufficient evidence. This means the instruction was factually supported." 296 Kan. at 204.

Based on the facts at trial, the jury could reasonably have found that Harris' actions were intentional but not premeditated. Thus, the district court did not err in instructing on the lesser included offenses of second-degree murder and attempted second-degree murder. Had it not done so, a weightier claim of error may have arisen.

*Was Harris Denied His Right to Present Evidence that Supported His Theory of Defense When the District Court Prohibited Questioning About Past Investigative Tactics by the Detective?*

Harris next raises an evidentiary issue. He argues that the district court impeded his fundamental right to a fair trial by prohibiting him from presenting evidence that supported his theory of defense. Harris argues that he should have been allowed to question Detective Brian Johnson about a past investigation in which Johnson targeted a suspect who was later ruled out when someone else conducted a DNA test. Harris contends this line of questioning would have discredited Johnson and his investigation in this case. Harris generally contends that Johnson should have done more to pursue the person who allegedly left the scene on a red minibike. At trial, the State objected that the evidence was not relevant and the district court agreed. On appeal, the State argues that because Johnson's impeachment would have been accomplished by using specific instances of conduct, such evidence was inadmissible. It thus contends the district court was right for a different reason than it found below.

*Standard of Review*

The trial court violates a criminal defendant's fundamental right to a fair trial if the court excludes relevant, admissible, and noncumulative evidence which is an integral part of the theory of the defense. But the right to present a defense is subject to statutory rules and judicial interpretation of the rules of evidence and procedure. *State v. Roeder*, 300 Kan. 901, 927, 336 P.3d 831 (2014). When a criminal defendant asserts that the district court unconstitutionally limited the right to present the chosen theory of defense, the appellate court reviews the issue de novo. *State v. Seacat*, 303 Kan. 622, 638, 366 P.3d 208 (2016). Although we are not fully persuaded that the excluded evidence limited Harris' right to present his theory of defense, in an abundance of caution we apply that standard of review.

*The District Court's Ruling Was Right for the Wrong Reason.*

The State argues that because the impeachment of the investigator's testimony could have been accomplished only by using specific instances of conduct, it was inadmissible. But at trial, the State did not raise that objection and instead argued that the impeachment evidence was irrelevant. Generally, a party may not object at trial to the admission of evidence on one ground and then on appeal argue a different ground, as the State does here. See *State v. McCormick*, 305 Kan. 43, 47, 378 P.3d 543 (2016). So, for example, a defendant who objects at trial only to the evidence's relevance cannot claim on appeal that the evidence was unduly prejudicial. 305 Kan. at 47. But here, the defendant, not the State, is appealing this issue, and this court has the authority to uphold a district court's decision even if it relied on the wrong ground or assigned erroneous reasons for its decision. See *State v. Overman*, 301 Kan. 704, 712, 348 P.3d 516 (2015).

We thus reach the State's argument about K.S.A. 60-420 et seq. This statute generally permits a party to introduce extrinsic evidence "concerning any conduct by [a

9

witness] or any other matter relevant" to attack a witness' credibility. K.S.A. 60-420. But K.S.A. 60-421 and K.S.A. 60-422 limit the evidence that may be used for that purpose. Character evidence "other than honesty or veracity or their opposites" is inadmissible. K.S.A. 60-422(c). And under K.S.A. 60-422(d), "evidence of specific instances of [a witness'] conduct relevant only as tending to prove a trait of [one's] character, shall be inadmissible."

Harris sought to admit evidence of a specific instance of Johnson's conduct—Johnson's failure to test for DNA in a robbery case earlier that year. Harris wanted to use that evidence to impeach Johnson's testimony by proving that he jumped the gun in naming a criminal suspect or failed to carefully investigate identity. Had Harris shown that Johnson had a habit of so doing, the proffered evidence would have been admissible. See K.S.A. 60-450 (stating evidence of specific instances of behavior is admissible to prove habit if the evidence is of a sufficient number of such instances to warrant a finding of such habit). But Harris proffered only one instance. No habit was shown.

The State does not specify what trait of Johnson's character the evidence would prove. But the proffered evidence generally relates to Johnson's character trait for care or skill. A different evidentiary rule specifically precludes that kind of evidence. K.S.A. 60-448 provides:  "Evidence of a trait of a person's character with respect to care or skill is inadmissible as tending to prove the quality of his or her conduct on a specified occasion." Thus evidence of Johnson's character with respect to his care or skill in investigating or targeting suspects is not admissible to prove his lack of care or skill in targeting a suspect on the date Garcia was shot.

This case illustrates one reason underlying the statutory exclusion for this kind of evidence. If Harris could have used the proffered evidence to impeach Johnson's credibility or investigation, the State could have rehabilitated Johnson with testimony showing all the times Johnson properly targeted a suspect. This would take an inordinate

10

amount of time at trial without adding probative value to the facts of this case. The circumstances surrounding Johnson's prior investigation were not pertinent to Harris' case, and there was nothing materially exculpatory in the excluded evidence. See *State v. Torrence*, No. 114,546, 2017 WL 1535137, at *8 (Kan. App. 2017) (unpublished opinion) (finding the district court properly excluded evidence under K.S.A. 60-422 when the evidence merely showed the detective was mistaken as to the timing of the collection of evidence in an unrelated case, and that evidence only tended to impeach his credibility). We find the district court properly excluded the proffered evidence.

*Should Harris' Convictions Be Reversed for Cumulative Error?*

Harris next argues that reversal is required because his convictions are based on the cumulative effect of multiple trial errors. But having found no error, we find no cumulative error. See *State v. Butler*, 307 Kan. 831, 868, 416 P.3d 116 (2018). "[I]f there is no error or only a single error, cumulative error does not supply a basis for reversal." *State v. Love*, 305 Kan. 716, 737, 387 P.3d 820 (2017).

*Was Harris' Criminal History Improperly Used to Increase His Sentence?*

Harris argues that his criminal history was unconstitutionally used to increase his sentence because his prior crimes should have been submitted to the jury and proved beyond a reasonable doubt in this case. However, our Supreme Court has squarely rejected this argument. *State v. Ivory*, 273 Kan. 44, 46-48, 41 P.3d 781 (2002).

We are duty bound to follow Kansas Supreme Court precedent, absent some indication our Supreme Court is departing from its previous position. *State v. Meyer*, 51 Kan. App. 2d 1066, 1072, 360 P.3d 467 (2015). We find no such indication. Instead, in *State v. Sullivan*, 307 Kan. 697, 708-09, 414 P.3d 737 (2018), our Supreme Court reaffirmed its holding in *Ivory* that the use of criminal history to calculate the

11

presumptive Kansas Sentencing Guidelines Act sentence does not violate due process as interpreted by *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000).

Affirmed.